1  Gayle M. Blatt (SBN 122048)
   *gmb@cglaw.com*
2  Jeremy Robinson (SBN 188325)
   *jrobinson@cglaw.com*
3  Jason C. Evans (SBN 272932)
   *jevans@cglaw.com*
4
   CASEY GERRY SCHENK
5  FRANCAVILLA BLATT & PENFIELD LLP
6  110 Laurel Street
   San Diego, California 92101
7  (619) 238-1811 phone
   (619) 544-9232 fax
8

9  Mark Ankcorn (166871)
   *mark@ankcorn.com*
10 ANKCORN LAW FIRM, PC
11 11622 El Camino Real, Suite 100
   Del Mar, California 92130
12 (619) 870-0600 phone
   (619) 684-3541 fax
13

14 *Interim Class Counsel*

15                    UNITED STATES DISTRICT COURT

16          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

17

18 | **In re 23andMe Consumer Products** | Lead Case No.  5:13-cv-05682 LHK |

19 | **Litigation** | (Consolidated with Case Nos. 5:14-cv-294; 5:14-cv-429, 5:14-cv-1167; 5:14-cv-1191; 5:14-cv-1258) |

20 This Document Relates to:

21

22 ALL ACTIONS | **Plaintiffs' Opposition to Omnibus Motion to Compel Arbitration** (ECF No. 69) |

23

24 | Date:        June 19, 2014 |

25 | Time:        1:30 p.m. |

26 | The Honorable Lucy H. Koh |

27

28

# TABLE OF CONTENTS

**Introduction** ................................................................................................ 1

**Statement of Relevant Facts** ..................................................................... 2

I.    Plaintiffs have filed suit against 23andMe for statutory violations and various common law counts ................................................................. 2

II.   23andMe's website "Terms of Service" has unconscionable arbitration language buried at the very end ................................................................ 4

**Argument** ..................................................................................................... 6

I.    The threshold issues of enforceability and unconscionability were not, and cannot be, delegated to an arbitrator ................................................. 6

    A.   Under California law, this Court must decide the issue of unconscionability ......................................................................................... 7

    B.   The Terms of Service are Ambiguous and must be construed against 23andMe ................................................................................................... 9

    C.   Reference to the "rules and auspices" of AAA is insufficient to meet the heightened standard here and confer power to decide enforceability to an arbitrator ............................................................................................ 10

II.   There is no valid agreement to arbitrate here because plaintiffs did not agree to the Terms of Service, if at all, until after purchase of the PGS ............. 14

    A.   Class members did not agree to the Terms of Service or arbitration when purchasing the PGS ................................................................... 15

    B.   There was no valid post-purchase agreement to arbitrate .................... 16

III.  The arbitration clause in the Terms of Service is procedurally and Substantively unconscionable and cannot be enforced ............................. 18

    A.   The arbitration clause is procedurally unconscionable .................... 19

    B.   The arbitration clause is substantively unconscionable ................. 20

    C.   The arbitration clause cannot be severed ...................................... 24

**Conclusion** ................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*24 Hour Fitness, Inc. v. Superior Court*
    66 Cal.App.4th 1199 (1998) ........................................................................18

*Ajamian v. CantorC02e, L.P.*
    203 Cal.App.4th 771 (2012) ..............................................................2, 7, 11, 12

*Armendariz v. Foundation Health PsychareServs.*
    24 Cal.4th 83 (2000) ................................................................... 18, 22-24

*AT & T Techs., Inc. v. Communications Workers of Am.*
    475 U.S. 643 (1986) ....................................................................................14

*Baker v. Osborne Development Corp.*
    159 Cal.App.4th 884 (2008) .................................................................... 9-10

*Be In, Inc. v. Google, Inc.*
    Case No. 5:12-cv-3373 LHK, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) .......... 15-16

*Biller v. Toyota Motor Corp.*
    668 F.3d 655 (9th Cir. 2012) ........................................................................8

*Carmona v. Lincoln Millennium Car Wash, Inc.*
    ___ Cal.App.4th __, 2014 WL 1873966 (Apr. 21, 2014) ........................................... 1-2

*Circuit City Stores, Inc. v. Adams*
    279 F.3d 889 (9th Cir. 2001) ......................................................................22

*Comb v. PayPal, Inc.*
    218 F.Supp.2d 1165 (N.D.Cal. 2002) ........................................................1, 4, 17, 22

*Coutee v. Barington Capital Group, L.P.*
    336 F.3d 1128 (9th Cir. 2003) ......................................................................8

*First Options of Chicago, Inc. v. Kaplan*
    514 U.S. 938 (1995) ................................................................................6, 9

*Fitz v. NCR Corp.*
    118 Cal.App.4th 702 (2004) ...................................................................... 24

*Frid v. First Republic Bank*
    Case No. 3:12-cv-806, 2014 WL 1365933 (N.D. Cal., Apr. 7, 2014) ..........................7

*Gibson v. Neighborhood Health Clinics, Inc.*
    121 F.3d 1126 (7th Cir. 1997) .................................................................... 17

*Gilbert Street Developers, LLC v. LaQuinta Homes, LLC*
    174 Cal.App.4th 1185 (2009) ............................................................... 11-12

*Guidewire Software, Inc. v. Chookaszian*
    2012 WL 5379589 (N.D. Cal. Oct. 31, 2012) .......................................13

*Gutierrez v. Autowest, Inc.*
    114 Cal.App.4th 77 (2003) ............................................................2, 19, 21

*Harper v. Ultimo*
    113 Cal.App.4th 1402 (2003) ...............................................................20

*Hartley v. Superior Court*
    196 Cal.App.4th 1249 (2011) ...........................................................7, 10

*Ingle v. Circuit City Stores, Inc.*
    328 F.3d 1165 (9th Cir. 2003) .................................................................. 22

*Lhotka v. Geographic Expeditions, Inc.*
    181 Cal.App.4th 816 (2010) ................................................................... 24

*Little v. Auto Stiegler, Inc.*
    29 Cal.4th 1064 (2003) .........................................................................19

*Merkin v. Vonage America, Inc.*
    Case No. 2:13-cv-8026, 2014 WL 457942 (C.D.Cal., Feb. 3, 2014) ................2, 22, 24

*Murphy v. Check 'n' Go of California, Inc.*
    156 Cal.App.4th 138 (2007) ............................................................. 2, 6-8

*Nagrampa v. MailCoups, Inc.*
    469 F.3d 1257 (9th Cir. 2006) ...............................................................12

*Newton v. American Debt Services, Inc.*
    549 Fed.Appx. 692 (9th Cir. 2013) ......................................................... 22

*Ontiveros v. DHL Exp. (USA), Inc.*
    164 Cal.App.4th 494 (2008) ............................................................... 6-8

*Oracle America, Inc. v. Myriad Group AG*
    724 F.3d 1069 (9th Cir. 2013).................................................................13

*Parada v. Superior Court*
    176 Cal.App.4th 1554 (2009) ...............................................................21

*Patterson v. ITT Consumer Financial Corp.*
    14 Cal.App.4th 1659 (1993) ......................................................................19

*Peleg v. Neiman Marcus Group*
    204 Cal.App.4th 1425 (2012) ...............................................................7, 10

*Perdue v. Crocker National Bank*
    38 Cal.3d 913 (1985) ...........................................................................  18

*Prima Paint v. Flood & Conklin*
    388 U.S. 395 (1967) ..................................................................................8

*Pinnacle Museum Tower Ass'n v. Pinnacle Market Development*
    55 Cal.4th 223 (2012) ......................................................................18-19

*ProCD, Inc. v. Zeidenberg*
    86 F. 3d 1447 (7th Cir. 1996) .................................................................17

*Rent-A-Center, W., Inc. v. Jackson*
    561 U.S. 63, 130 S.Ct. 2772 (2010) ....................................................6, 9

*Roldan v. Callahan & Blaine*
    219 Cal.App.4th 87 (2013) ..............................................................2, 19, 21

*Samaniego v. Empire Today LLC*
    205 Cal.App.4th 1138 (2012) ...........................................................19, 23

*Sanchez v. Western Pizza Enterprises, Inc.*
    172 Cal.App.4th 154 (2009) ....................................................................11

*Sonic-Calabasas A, Inc. v. Moreno*
    57 Cal.4th 1109 (2013) ...........................................................................19

*Sparks v. Vista Del Mar Child & Family Services*
    207 Cal.App.4th 1511 (2012) ...........................................................20-21

*Specht v. Netscape Communications Corp.*
    306 F.3d 17 (2d Cir. 2002) ..................................................................15-16

*Stirlen v. Supercuts, Inc.*
    51 Cal.App.4th 1519 (1997) ....................................................................18

*Tiri v. Lucky Chances, Inc.*
    ___ Cal.App.4th ___, 2014 WL 1961845 (May 15, 2014) ...........................6

*Trivedi v. Curexo Technology Corp.*
        189 Cal.App.4th 387 (2010) ...................................................................20

*Volt Info.Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*
        489 U.S. 468, 109 S. Ct. 1248 (1989)  ..................................................1

*Western Lithograph Co. v. Vanomar Producers*
        185 Cal. 366 (1921) ........................................................................... 17

*In re Zappos.com, Inc. Customer Data Sec. Breach Litigation*
        893 F.Supp.2d 1058 (D. Nev. 2012)  .............................................. 17, 23

*Yahoo! Inc. v. Iverson*
        836 F.Supp.2d 1007 (N.D. Cal. 2011)  .......................................... 13-14

**Statutes and Other Authority**

Business & Professions Code §§ 17200 *et seq*..............................................3
Business & Professions Code §§ 17500 *et seq*..............................................4
Civil Code § 1550 ...................................................................................... 17

1

## Introduction and Summary of Argument

2   Although arbitration "is a matter of consent," *Volt Info. Sciences, Inc. v. Bd. of*

3   *Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989), 23andMe's request to

4   banish its customers' claims to the arbitral forum shows only coercion. Indeed, there is

5   not even a valid agreement to arbitrate here because the Terms of Service were forced

6   on some (but not all) 23andMe customers long after the product had been purchased

7   and received and there was no consideration for acceptance of those terms.

8   Further, the arbitration clause here is not only hidden at the end of an 18 page

9   agreement, it also is one-sided and oppressive. First, the clause is worded in a way that

10  binds only claims made *against* 23andMe, not claims made *by* it. In other words,

11  23andMe gets to choose the forum when it has a legal dispute; the consumer can only

12  capitulate to the forum mandated by 23andMe.

13  Second, the terms of the arbitration clause make individual consumer claims a

14  practical impossibility. Any consumer pursuing arbitration must: (1) pay nearly $1000

15  in arbitration filing fees; (2) arrange to have all of the necessary evidence and witnesses

16  flown to San Francisco, a location in 23andMe's back yard; (3) pay for and provide an

17  interpreter if any of the parties or witnesses are not fully fluent in English; (4) become

18  familiar with arbitration rules that are the equal in complexity of any code of civil

19  procedure or hire an attorney to do so; and (5) be prepared to pay all of the costs of

20  arbitration, including the arbitrator's travel costs and room rental fee, *and,* if the

21  consumer does not prevail, pay all of 23andMe's undoubtedly substantial legal fees.

22  ECF No. 70-10, ¶ 28, subd. (b). All for a product that cost $100-$400.

23  Numerous state and federal courts applying California law have found similar

24  purported arbitration clauses unenforceable. *See Comb v. Paypal, Inc.*, 218 F.Supp.2d

25  1165, 1176-1177 (N.D.Cal. 2002) (finding nearly identical arbitration provision

26  unconscionable in nationwide class action because of excessive cost to litigants and

27  requirement that arbitration be conducted in Santa Clara County, Paypal's "back

28  yard"); *Carmona v. Lincoln Millennium Car Wash, Inc.* ___ Cal.App.4th __, 2014 WL

1873966 (Apr. 21, 2014) (arbitration clause requiring arbitration for weaker party while giving stronger party access to the court unconscionable); *Merkin v. Vonage America, Inc.*, Case No. 2:13-cv-8026, 2014 WL 457942 (C.D.Cal., Feb. 3, 2014) (same); *Gutierrez v. Autowest, Inc.*, 114 Cal.App.4th 77, 89-91 (2003) (mandatory arbitration agreement unconscionable because it required plaintiffs to pay substantial fees to initiate the arbitration process); *Roldan v. Callahan & Blaine*, 219 Cal.App.4th 87, 94-95 (2013) (faulting arbitration clause because it "reflects no effort to ensure that clients of limited means would have equal access to the alternative forum it mandates.")

23andMe argues, however, that the issue never reaches this Court. It says there is "clear and unmistakable evidence" its customers agreed to delegate to an arbitrator gateway issues like enforceability, solely because the arbitration provision references— but does not provide or even link to—the "rules and auspices of the American Arbitration Association." Not so.

Under California law, which the Terms of Service specifically invoke, an adhesive delegation clause giving the arbitrator power to decide unconscionability is *itself* substantively unconscionable and not enforceable. *Murphy v. Check 'n' Go of California, Inc.*, 156 Cal.App.4th 138, 145 (2007). It follows that a provision only referencing the rules of AAA is equally, if not more, unenforceable. See, *Ajamian v. CantorCO2e, L.P.*, 203 Cal.App.4th 771, 790 (2012) ("[W]e seriously question how [incorporation of AAA rules] provides *clear* and *unmistakable* evidence that [the parties] intended to submit the issue of the unconscionability of the arbitration provision to the arbitrator, as opposed to the court") (emphasis in original).

## Statement of Relevant Facts

### I. Plaintiffs have filed suit against 23andMe for statutory violations and common law counts

Plaintiffs in this case hail from all parts of the United States and are purchasers of 23andMe's DNA screening service called the "PGS." Stanton Decl., ¶¶ 3-8; Dilger Decl.,

1   ¶¶ 3,8; Guthrie Decl., ¶¶1-4. Several nationwide class actions have been filed against

2   23andMe and have been consolidated in this Court[1].

3       In general terms, all plaintiffs allege that 23andMe misleadingly marketed and

4   sold the PGS to consumers knowing that it lacked regulatory approval to do so, and

5   knowing that its marketing claims were not supported by clinical data. See, e.g., Dkt.

6   70-11, ¶¶ 18-45 (*Tompkins* Complaint), 70-12, ¶¶ 9-45 (*Aeron* First Amended Complaint),

7   70-16 ¶¶ 13-32 (*Spreter* Complaint), etc. Consumers purchased the PGS under the

8   mistaken belief (created by 23andMe's misleading marketing) that it would allow them

9   to determine a vast number of genetic traits, including predisposition to diseases, drug

10  sensitivity, and other information[2]. *Id*. In fact, 23andMe had no evidence the product

11  worked as advertised. *Id*.

12      The FDA had been looking into 23andMe and the PGS for several years. In light

13  of 23andMe's refusal to comply, the FDA finally ordered 23andMe to "immediately

14  discontinue marketing the PGS until such time as it receives FDA marketing

15  authorization for the device." FDA Letter to 23andMe, Ankcorn Decl., Exh. 1. Instead of

16  ceasing altogether, 23andMe dropped any health-related claims from its marketing of

17  the PGS and continues to sell it[3].

18      Plaintiffs have alleged similar iterations of causes of action for unfair and

19  fraudulent practices in violation of Business & Professions Code §§ 17200 *et seq*.,

20  unlawful business practices in violation of Business & Professions Code §§ 17200 *et seq*.,

---

21      [1] The first case against 23andMe was filed well before the copycat complaint in
22  *Livingston* was filed with AAA and so 23andMe's claim that "sophisticated counsel"
    somehow recognize the cases are destined for arbitration is false. Motion to Compel,
23  p. 4:16-19 (ECF No. 69-1). That was a play for position, not legal commentary.

24      [2] Although 23andMe goes to some length to disclaim any relation between the
    PGS and legitimate medical diagnoses, it is difficult to imagine anyone getting a
25  DNA workup related to genetic and inherited traits, including susceptibility to a
    number of maladies, seeing it as anything else.

26      [3] 23andMe claims the FDA "withdrew" its warning letter, but that is an
    overstatement. Motion to Compel, p. 3:2 (ECF No. 69-1). In fact, the FDA simply sent
27  23andMe a follow-up letter saying that since 23andMe stopped doing what the FDA
    considered unlawful, the company had "addressed the violation(s)." Letter of March
28  25, 2014 (Ankcorn Decl., Exh. 2).

---

1   false advertisement in violation of Business & Professions Code §§ 17500 *et seq.*,

2   violations of the Consumer Legal Remedies Act, breach of warranty, unjust enrichment,

3   deceit by concealment, and negligent misrepresentation[4]. See, ECF Nos. 70-11 through

4   70-17 (Complaints).

5

## II.   23andMe's website "Terms of Service" has an unconscionable arbitration clause buried at the very end

8   23andMe asserts that customers wanting to set up an account with 23andMe

9   must click on an on screen tab saying they agree to 23andMe's "Terms of Service." See

10   Hillyer Decl., ¶ 2-6, ECF No. 71. But this does not happen when the customer buys the

11   PGS. Ankcorn Decl., ¶¶ 10-11; Dilger Decl., ¶ 4; Stanton Decl., ¶ 7. Instead, it is much

12   later, if and when a customer decides to "register" the PGS on the website. Ankcorn

13   Decl., ¶ 10-11.

14   Not all customers register the product. Indeed, 23andMe has not submitted

15   competent evidence that plaintiffs here ever did so, instead opting for a conclusory

16   statement from its employee that 23andMe's "records indicate" plaintiffs signed up for

17   an account. That is not enough. See *Comb v. PayPal, Inc.,* 218 F.Supp.2d at 1171-1172

18   ("the applicable statutes require production of a *record* that the parties have entered into

19   an agreement …" (emphasis in original)).

20   The arbitration clause 23andMe is trying to enforce here is crammed at the very

21   end of the Terms of Service. The clause appears in a subsection of a paragraph

22   captioned "Miscellaneous," which is the final paragraph in a document overflowing

23   with legalese and that, when printed, takes up 18 pages. ECF No. 70-10, ¶ 28. Unlike

24   some other clauses 23andMe deems important (mostly privacy and intellectual property

25   issues, and various disclaimers from 23andMe about the validity of the PGS), the

26

27   _____

[4] The *Newland* complaint (ECF No. 70-15) alleges causes of action based on
28   Illinois law but they mirror in substance the remaining plaintiffs' claims under
California law.

subsection is not bolded or italicized and nothing is done to draw reader attention to it.

*Id*.

The clause reads:

> **Applicable law and arbitration:** Except for any disputes relating to intellectual property rights, obligations, or any infringement claims, any disputes with 23andMe arising out of or relating to the Agreement ("**Disputes**") shall be governed by California law regardless of your country of origin or where you access 23andMe, and notwithstanding of any conflicts of law principles and the United Nations Convention for the International Sale of Goods. Any disputes shall be resolved by final and binding arbitration under the rules and auspices of the American Arbitration Association, to be held in San Francisco, California, in English, with a written decision stating legal reasoning issued by the arbitrator(s) at either party's request, and with arbitration costs and reasonable documented attorney's costs of both parties to be borne by the party that ultimately loses. Either party may obtain injunctive relief (preliminary or permanent) and orders to compel arbitration or enforce arbitral awards in any court of competent jurisdiction. Dkt. 70-10, ¶ 28, subd. (b) (emphasis in original).

Some key points stand out. First, the clause says it governs "disputes *with* 23andMe." (emphasis added). The only plausible reading of this is that it applies solely to claims made *against* 23andMe and not *by* 23andMe, since 23andMe cannot have a dispute with itself. So it is entirely one-sided in favor of 23andMe. Second, it requires arbitration to be held in San Francisco and in English, regardless of where in the world the customer lives or what language the customer speaks. Third, it references "the rules and auspices of" AAA, but does not say which rules would apply or tell a customer where to find them. Fourth, it makes no provision for 23andMe to advance the filing fees to the customer ($775 dollars for a claim worth $10,000 or less, plus a "final" fee of $200 (ECF No. 70-20, p. 41)), nor for a waiver of those fees if the customer cannot afford them. And, finally, the loser pays not only costs but attorney fees.

<u>**Argument**</u>

**I.    The threshold issues of enforceability and unconscionability were not, and cannot be, delegated to the arbitrator**

23andMe devotes a substantial portion of its brief to arguing that the "gateway" issue of enforceability of the arbitration language must be decided by an arbitrator rather than this Court. The argument fails. First, 23andMe relies exclusively on federal decisions for support. But the "Terms of Service"—drafted by 23andMe—say disputes with 23andMe "shall be governed by *California law*" regardless of where the plaintiff lives and "notwithstanding of any conflicts of law principles and the United Nations Convention for the International Sale of Goods." ECF No. 70-10, ¶ 28, subd. (b) (emphasis added). And California law holds the question of unconscionability cannot be delegated to an arbitrator. *Ontiveros v. DHL Exp. (USA), Inc.*, 164 Cal.App.4th 494, 505; *Murphy v. Check 'n' Go of California, Inc.*, 156 Cal.App.4th 138, 145[5].

Second, even in relying on those federal cases, 23andMe omits their key holding, which is that 23andMe must show by "clear and unmistakable" evidence that the parties intended to delegate the issue to the arbitrator. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, fn. 1 (2010) ("[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator").

There is no "clear and unmistakable" evidence here. On the contrary, the Terms of Service are entirely silent on the issue. And, California courts have regularly rejected similar arguments in cases where the intent to delegate the gateway issues to an arbitrator is arguably much stronger. See, *Ajamian*, 203 Cal.App.4th at 790, *Hartley v.*

---

[5] Shortly before this Opposition was filed, *Tiri v. Lucky Chances, Inc.*, ___ Cal.App.4th ___, 2014 WL 1961845 (May 15, 2014) was published by a division of the appellate court. In that case, the court, relying on federal law, disagreed that delegation clauses are "categorically unenforceable" in California, but applied the clear and unmistakable evidence rule from *First Options*. *Id*. at *9. Since, as discussed in Sections I (B) and (C), *infra*, the outcome is the same under either test, *Tiri* does not impact this case.

*Superior Court*, 196 Cal.App.4th 1249, 1256 (2011), and *Peleg v. Neiman Marcus Group, Inc.*, 204 Cal.App.4th 1425, 1441 (2012). Under either test, the determination rests with this Court.

### A.   Under California law, this Court must decide the issue of unconscionability

Under California law, plaintiffs and the class cannot be forced through a contract of adhesion to relinquish to the arbitrator the power to decide unconscionability. This rule was first set out in *Murphy v. Check 'n' Go of California, Inc.*, 156 Cal.App.4th 138, a wage and hour class action. The defendant there moved to compel arbitration and argued that the issue of unconscionability was for the arbitrator because the agreement provided that "any assertion by you or us that this Agreement is substantively or procedurally unconscionable" was to be decided by the arbitrator. *Id.*

The *Murphy* court rejected the argument. It held that "[w]hile the language of the agreement could not be clearer," the plaintiff did not agree to the provision because, like here, "it was set forth in a contract of adhesion, i.e., a standardized contract drafted by the stronger party and presented to the weaker party on a take it or leave it basis." *Id.* at 144 (citation omitted). The court also found the delegation clause was itself substantively unconscionable because it was unfairly one-sided: "[A]s plaintiff points out, the provision is entirely one-sided because defendant cannot be expected to claim that it drafted an unconscionable agreement." *Id.* The court thus concluded, "in this contract of adhesion, the provision for arbitrator determinations of unconscionability is unenforceable." *Id.*

*Ontiveros v. DHL Exp. (USA), Inc.*, 164 Cal.App.4th 494, expanded on this idea. The defendant there argued, as 23andMe does here, that gateway issues including unconscionability should have been decided by an arbitrator. The arbitration agreement had a delegation clause providing that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to

the interpretation, applicability, enforceability or formation of this Agreement …" and that "arbitration would be held under the auspices of either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Services, Inc. (JAMS) …" *Id.* at 499-500. The *Ontiveros* court was not convinced.

The court discussed the holding in *Murphy* at some length and agreed with its conclusion. In refusing to enforce the delegation clause, the court said: "We … find, in the present case — which also indisputably involves a contract of adhesion — that the provision in the arbitration agreement giving the arbitrator exclusive authority to decide enforceability issues is unconscionable and, therefore, unenforceable." *Ontiveros* at 505 (footnotes omitted). The court also expressed "a genuine concern about the potential for the inequitable use of such arbitration provisions" where "the parties are not at arm's length and do not have equal bargaining power" because "the arbitrator has a unique self-interest in deciding that a dispute is arbitrable." *Id.* See also *Prima Paint v. Flood & Conklin*, 388 U.S. 395, 407, 416 (1967) (dis. opn. of Black, J.) ("The only advantage of submitting the issue of fraud to arbitration is for the arbitrators. Their compensation corresponds to the volume of arbitration they perform. If they determine that a contract is void because of fraud, there is nothing further for them to arbitrate.")

These concerns are well-founded. A court's review of an arbitrator's decision is "both limited and highly deferential." *Coutee v. Barington Capital Group, L.P.*, 336 F.3d 1128, 1132 (9th Cir. 2003); see also *Frid v. First Republic Bank*, Case No. 3:12-cv-806, 2014 WL 1365933 (N.D. Cal., Apr. 7, 2014) (same). A court cannot review the decision on the merits, and the parties cannot by contract expand the scope of judicial review. *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 664 (9th Cir. 2012). As such, it is troublesome, to say the least, to vest in a self-interested arbitrator the power of a sitting judge while at the same time denying the parties the due process protections of judicial review.

*Murphy* and *Ontiveros* dictate the outcome here. 23andMe's argument that referencing the rules of AAA is tantamount to having an express delegation clause in the Terms of Service (itself a dubious proposition; see below) still gets it nowhere

1   because under California law, a delegation clause of that sort is unconscionable when

2   contained in a contract of adhesion.

3

4       **B.      The Terms of Service are ambiguous as to who will decide**

5               **enforceability issues and must be construed against 23andMe**

6           The same result is reached under the "clear and unmistakable" evidence test in

7   federal law. That test demands a "heightened standard" of proof, *Rent–A–Center*, 130

8   S.Ct. at 2777, fn. 1, a standard 23andMe takes pains to avoid mentioning. The standard

9   is rigorous because the question of who would decide the unconscionability of an

10  arbitration provision is not one the parties would normally consider, and the default

11  expectancy is that the court would decide it. *First Options of Chicago, Inc. v. Kaplan*, 514

12  U.S. 938, 943–945 (1995). Thus, a contract's silence or ambiguity about the arbitrator's

13  power cannot satisfy the clear and unmistakable evidence standard. *Id.* at 943–945.

14          Here, 23andMe concedes there is no direct evidence plaintiffs and the class

15  intended to permit an arbitrator to decide this issue. The Terms of Service, though quite

16  lengthy and obviously drafted by seasoned legal counsel, make no mention of this

17  issue. In fact, the only pertinent language on that issue is found after the arbitration

18  clause, and it suggests just the opposite—that a *court* will decide contract formation

19  issues. It reads that "[i]f any provision of the TOS is found by *a court of competent*

20  *jurisdiction* to be invalid, …" ECF No. 70-10, ¶ 28, subd. (c) (emphasis added).

21          This kind of ambiguity has led several California courts applying the "clear and

22  unmistakable" standard to reject attempts to have arbitrators decide gateway issues,

23  even in the face of express delegation language. For example, in *Baker v. Osborne*

24  *Development Corp.*, 159 Cal.App.4th 884 (2008), the court held gateway issues were to be

25  decided by the judge, even though the arbitration agreement specifically said that

26  enforceability of the agreement was to be decided by the arbitrator, because a later

27  severability provision referenced both arbitrators and "any court." *Id.* at 891. The court

28  reasoned that there was not "clear and unmistakable" evidence of delegation to the

arbitrator because "although one provision of the arbitration agreement stated the issues of enforceability or voidability were to be decided by the arbitrator, another provision indicated that the court might find a provision unenforceable." *Id.* at 893-894.

Numerous courts have followed *Baker*. See, e.g., *Prada v. Superior Court*, 176 Cal.App.4th 1554, 1566 (2009) (conflict between provision delegating enforcement decision to arbitrator and severability provision referencing a finding by "a trier of fact of competent jurisdiction" defeated clear and unmistakable argument); *Hartley*, 196 Cal.App.4th at 1261 (same); *Peleg*, 204 Cal.App.4th at 1444-1445 ("inconsistency between the Agreement's delegation and severability provisions indicates the parties did not clearly and unmistakably delegate enforceability questions to the arbitrator").

So too here. Given that the Terms of Service here do not even have a delegation provision, the holdings in *Baker*, *Prada*, *Hartley*, and *Peleg* apply with even greater force. If those courts found the ambiguous language presented too high a hurdle despite an express delegation clause, certainly it is fatal to a showing of clear and unmistakable intent here.

### C. Reference to the "rules and auspices" of AAA is insufficient to meet that heightened standard here and confer the power to decide enforceability to an arbitrator

23andMe nonetheless insists that the Terms of Service set forth an intent to delegate gateway issues to an arbitrator because of a proviso that arbitration will be conducted under the "rules and auspices of the American Arbitration Association …" ECF No. 70-10, ¶ 28, subd. (b). In support of that, 23andMe cites decisions, including two from this Court, that it asserts hold "reference to arbitration under the AAA Rules requires that gateway questions regarding arbitrability be referred to arbitration." ECF No. 69-1, p. 7:2-3.

While some courts have, in certain cases, made that finding, 23andMe greatly overstates the reach of those holdings and their application here. None are California

1    state law cases. And, in the vast majority of the decisions, both parties to the agreement

2    were sophisticated business entities, not individual consumers.

3        The fact remains that no reported California decision holds reference to AAA

4    rules is enough to take the issue of unconscionability away from the court. Most courts

5    suggest the opposite is true. See, e.g., *Sanchez v. Western Pizza Enterprises, Inc.*, 172

6    Cal.App.4th 154, 166 (2009) ('[T]he question whether the arbitration agreement is

7    enforceable based on general contract law principles, including the question whether it

8    is unconscionable or contrary to public policy, is a question for the court to decide

9    rather than an arbitrator, regardless of whether the FAA applies"); *Ajamian*, 203

10   Cal.App.4th at 789 (California courts have not held unconscionability can be delegated

11   to arbitrator); and *Gilbert Street Developers, LLC v. LaQuinta Homes, LLC*, 174 Cal.App.4th

12   1185, 1195-1196 (2009) (noting majority of federal circuit courts hold that the

13   incorporation of NASD rules in arbitration agreements were insufficient to show a clear

14   and unmistakable agreement to have arbitrators decide their own jurisdiction).

15       The most recent and mostly clearly thought out position comes from *Ajamian*. In

16   that case, the court, after acknowledging some variation in the reported decisions,

17   observed: "[W]e seriously question how [incorporation of AAA rules] provides *clear*

18   and *unmistakable* evidence that an employer and an employee intended to submit the

19   issue of the unconscionability of the arbitration provision to the arbitrator, as opposed

20   to the court." *Id.* at 790 (emphasis in original). This is, in part, because "[t]here are many

21   reasons for stating that the arbitration will proceed by particular rules, and doing so

22   does not indicate that the parties' motivation was to announce who would decide

23   threshold issues of enforceability." *Id.*

24       The *Ajamian* court explained that reference to AAA rules does not give "much of

25   a clue that [the signer] is giving up her usual right to have the court decide whether the

26   arbitration provision is enforceable." *Id.* at 790. Assuming that party asked to sign the

27   agreement "reads the arbitration provision in the proposed agreement, notes that

28   disputes will be resolved by arbitration according to AAA rules, and even has the

1   wherewithal and diligence to track down those rules, examine them, and focus on the

2   particular rule to which appellants now point, the rule merely states that the arbitrator

3   shall have 'the power' to determine issues of its own jurisdiction, including the

4   existence, scope and validity of the arbitration agreement." *Id*. In the court's view,

5   "[t]his tells the reader almost nothing, since a court *also* has power to decide such issues,

6   and nothing in the AAA rules states that the AAA arbitrator, as opposed to the court,

7   *shall* determine those threshold issues, or has *exclusive* authority to do so, particularly if

8   litigation has already been commenced." *Id*. (emphasis in original).

9       The *Ajamian* court was "mindful of what the United States Supreme Court has

10  emphasized unflinchingly for decades": "[G]iven the slim likelihood that the parties

11  actually contemplated who would determine threshold enforceability issues, as well as

12  the default presumption that such issues would be determined by the court, those

13  threshold issues must be decided by the court absent *clear and unmistakable* proof to the

14  contrary." *Id* at 789-790 (emphasis in original). See also *Gilbert Street*, 174 Cal.App.4th at

15  1191-1192: "[T]he result must be clear and unmistakable, because the law is solicitous of

16  the parties actually *focusing* on the issue" (emphasis in the original); *Nagrampa v.*

17  *MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006) (en banc) (incorporation of AAA rules did

18  not deprive district court with power to decide whether the arbitration provision was

19  valid and enforceable within the meaning of the FAA.).

20      All of that makes sense here. Consider what 23andMe's argument about the rules

21  of AAA actually entails. 23andMe says that with the click of a mouse, a 23andMe

22  customer is deemed to have: (1) read and understood the entire 18 pages of the "Terms

23  of Service"; (2) agreed to be bound by every provision in it, including arbitration

24  language stuffed in the very last paragraph; (3) independently searched the internet for

25  the "rules and auspices of the American Arbitration Association"; (4) managed to figure

26  out which rules apply; (5) read the 50 plus pages of the rules for "Commercial

27  Arbitrations"; (6) noticed a rule stating "the arbitrator shall have the power to

28  determine the existence or validity of a contract of which an arbitration clause forms a

1  part"; (7) deduced from that general statement a "clear and unmistakable agreement" to

2  have a party with an obvious self-interest in the outcome decide the issue; and (8) have

3  willingly consented to it. No matter how favorably courts view arbitration in general,

4  that is a stretch far out of reach.

5      23andMe cites to various federal cases for a contrary proposition, but those cases

6  do not assist it. As mentioned, nearly all of them involve transactions between

7  sophisticated commercial entities. Indeed, in *Oracle America, Inc. v. Myriad Group, A.G.*,

8  724 F.3d 1069 (9th Cir. 2013), the Ninth Circuit was careful to limit its holding, declaring

9  that "as long as an arbitration agreement *is between sophisticated parties to commercial*

10  *contracts*, those parties shall be expected to understand that incorporation of

11  UNCITRAL rules delegates questions of arbitrability to the arbitrator." *Id*. at 1075

12  (emphasis added); see also *Fadal Machining 12 Ctrs., LLC v. Compumachine, Inc.*, 461 F.

13  App'x 630, 631 (9th Cir. 2011) (machine manufacturer and distributor); *Laguna v.*

14  *Coverall N. Am., Inc.*, Case No. 09-cv-2131 JM, 2011 WL 3176469, at *1 (S.D. Cal. July 26,

15  2011) (janitorial cleaning business and their franchisees); *Visa USA, Inc. v. Maritz, Inc.*,

16  2008 WL 744832 (N.D. Cal. Mar. 18, 2008) (credit card company and software

17  developer).

18      Nor do this Court's own rulings in *Guidewire Software, Inc. v. Chookaszian*, 2012

19  WL 5379589 (N.D. Cal. Oct. 31, 2012) and *Yahoo! Inc. v. Iverson*, 836 F.Supp.2d 1007 (N.D.

20  Cal. 2011) compel a different conclusion. Neither case resembles this litigation.

21  *Chookaszian* was a stock option purchase dispute between a sophisticated buyer and a

22  software company. The parties disputed whether an arbitration clause included in a

23  letter agreement applied to the dispute, and this Court ruled that was a matter to be

24  decided by an arbitrator. *Id*. at *3-4. *Yahoo!* is even farther removed from this case.

25  *Yahoo!* was an employment class action where the parties *agreed there was a valid and*

26  *binding arbitration agreement*, and the only questions confronting this Court were: "(1)

27  whether the arbitrability of class claims under the parties' contract should be

28  determined by the court or the arbitrator, and (2) what standard the appropriate

1    decision maker should apply in determining whether the contract allows class

2    arbitration." 836 F.Supp.2d at 1010. The *plaintiff* in that case argued the arbitrator should

3    decide whether class-wide arbitration was available, and this Court agreed. *Id*. at 1012.

4        At most, the cases cited by 23andMe show that in some commercial transactions

5    outside of the consumer context, courts applying federal law have found that referring

6    to arbitration rules is enough to show an intent to delegate gateway issues to the

7    arbitrator. But none of the cases holds that tactic works against a consumer who has no

8    understanding of the "rules and auspices of the American Arbitration Association" and

9    who is presented with a procedurally and substantively unconscionable agreement as a

10   precondition to setting up an account with 23andMe.

11

12   **II.     There is no valid agreement to arbitrate here because plaintiffs did not**

13   **agree to the Terms of Service, if at all, until after purchase of the PGS**

14       Save for a one-sentence footnote, 23andMe's motion ignores a key issue here—

15   the absence of an agreement to arbitrate. A party cannot be forced to submit to

16   arbitration a dispute that he or she has not agreed to arbitrate. *AT&T Techs., Inc. v.*

17   *Commcn's Workers of Am.*, 475 U.S. 643, 648 (1986); *Metters v. Ralphs Grocery Co.*, 161

18   Cal.App.4th 696, 701 (2008) ("there is no public policy favoring arbitration of disputes

19   which the parties have not agreed to arbitrate").

20       While 23andMe glosses over the issue, the law governing "browsewrap,"

21   "clickwrap," and "shrinkwrap" agreements shows there is no agreement to arbitrate

22   here. First, purchasers did not assent to the Terms of Service by their mere use of

23   23andMe's website and their purchase of 23andMe's product. Second, any alleged later

24   agreement to the Terms of Service during the creation of an account lacked

25   consideration and assent.

26

27

28

**A.**     **Class members did not agree to the Terms of Service or arbitration when purchasing the PGS**

Although the Internet may have prompted some clever names for categorizing alleged agreements, it has not fundamentally changed the requirements for a valid contract. *Hines v. Overstock.com*, 668 F. Supp. 2d 362, 366 (E.D. N.Y. 2009). It remains a fundamental tenant of contract law that the formation of a valid and binding contract requires a manifestation of mutual assent. *Specht v. Netscape Communs. Corp.*, 306 F. 3d 17, 29-30 (2d Cir. 2002); *Be In, Inc. v. Google Inc.*, Case No. 5:12-cv-3373 LHK, 2013 WL 5568706, at *22-23 (N.D. Cal. Oct. 9, 2013); *Hines, Inc.*, 668 F.Supp.2d at 366. For this reason, federal courts have repeatedly struck down so-called "browsewrap" agreements, including arbitration provisions, on the grounds that they were insufficient to establish the assent necessary for a binding contract. *See Specht*, 306 F. 3d 17; *Be In*, 2013 WL 5568706, at *32-34; *Nguyen v. Barnes & Noble, Inc.*, Case No. 8-12-cv-0812 JST, 2012 WL 3711081 (C.D. Cal. Aug. 28, 2012); *Hines*, 668 F.Supp.2d at 367.

"Browsewrap agreements are those that purport to bind the users of websites to which the agreements are hyperlinked." *Be In*, 2013 WL 5568706, at *23. Generally, the text of such an agreement, typically referred to as the "Terms of Use" or "Terms of Service," is located on a separate page accessible via a hyperlink on the bottom of the website. *Id.* "The defining feature of browsewrap agreements is that the user can continue to use the website or its service without visiting the page hosting the browsewrap agreement or even knowing the webpage exists." *Id.*

In the leading case on this issue, the *Specht* court held that plaintiff internet users' were not bound by a browsewrap license agreement requiring arbitration because there was no evidence of mutual assent. *Specht*, 306 F.3d 17. In affirming the lower court's decision to deny arbitration, then-Second Circuit Judge Sotomayor explained that a consumer would not have known of the license terms since the reference and hyperlink to the license agreement were located further down the webpage. *Id.* at 31, 35. The court concluded that the browsewrap agreement was insufficient to establish assent

since an offeree "is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Id.* at 30, 35.

Adopting the rationale of *Specht*, this Court reached a similar conclusion in *Be In v. Google*, where the plaintiff alleged that the defendants agreed to the "Terms of Service" linked on its homepage by simply visiting the website. *See Be In*, 2013 WL 5568706. This Court held that the pleadings were "insufficient to establish contract formation because, as a matter of law, they [did] not establish grounds for the Court to find a manifestation of Defendants' mutual assent to the Terms of Service." *Id.* at 32.

Much like the internet users in *Specht*, purchasers of 23andMe's PGS were not required to agree the Terms of Service when buying the PGS, nor was it made available as part of the checkout process. Ankcorn Decl., ¶ 10-11; Dilger Decl., ¶ 4; Stanton Decl., ¶ 7. Even assuming the TOS was available via a hyperlink at the bottom of Defendant's website, such a submerged arbitration agreement is insufficient as a matter of law to establish manifestation of assent. Based on this Court's ruling in *Be In* and now-Justice Sotomayor's opinion in *Specht*, the mere use of 23andMe's website is also insufficient to establish the assent required for a valid agreement to arbitrate, particularly where there is nothing to suggest that purchasers had actual or constructive knowledge of the Terms of Service when they bought the PGS.  "Very little is required to form a contract nowadays — but this alone does not suffice." *Hines*, 668 F.Supp.2d at 367.

### B.     There was no valid post-purchase agreement to arbitrate

23andMe's attempt to cast this non-binding "browsewrap" agreement as a binding "clickwrap" agreement is equally unavailing. First, 23andMe has not submitted competent evidence that plaintiffs ever agreed to the Terms of Service. Rather it offers a conclusory statement from one of its employees that 23andMe's "records indicate" plaintiffs signed up for an account. That is insufficient. See *Comb v. PayPal, Inc.*, 218 F.Supp.2d at 1171-1172.

1       23andMe also neglects to point out that for those consumers who created an

2    account to review their test results, the account creation and kit-registration process

3    occurred long *after* the product had been purchased, and almost certainly after the kit

4    had been received by the user. Ankcorn Dec at ¶ 10, Ex. 3. This does not create a valid

5    agreement to arbitrate because (1) there was no additional consideration to support a

6    binding clickwrap agreement; and (2) there was no adequate right to return the

7    product, as needed to support a binding shrinkwrap agreement to arbitrate.

8       Just as assent is a fundamental element of contract formation, so too is

9    consideration. Cal. Civ. Code § 1550; *Western Lithograph Co. v. Vanomar Producers*, 185

10   Cal. 366 (1921); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir.

11   1997). And, there is no special exception for clickwrap agreements. *In re Zappos.com, Inc.*

12   *Customer Data Sec. Breach Litigation*, 893 F.Supp.2d 1058 (D. Nev. 2012).

13      Here, there was no consideration given for being forced to accept the Terms of

14   Service. Any later agreement allegedly formed between 23andMe and its customers

15   would be a "shrinkwrap" agreement since it occurred post-purchase. Shrinkwrap

16   agreements are transactions where the product is purchased before the seller's terms are

17   fully conveyed. *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1451 (7th Cir. 1996). In the

18   traditional form, the consumer accesses the terms by opening the package and agrees to

19   them by keeping the merchandise. *See ProCD, Inc.*, 86 F.3d at 1451-53. The terms of a

20   shrinkwrap agreement become enforceable when the customer fails to return the

21   product for a full refund after a reasonable opportunity to read the terms of service. *Id.*

22   The right to return merchandise if the terms are unacceptable is a fundamental feature

23   of valid shrinkwrap agreements. *ProCD, Inc.*, 86 F.3d at 1451-52.

24      In this case, however, class members did not have a right to return the PGS for a

25   full refund if they found the arbitration provision unacceptable. According to the

26   refund policy on 23andMe's website, customers only have *60 minutes* within which to

27   cancel their order for a full refund. Ankcorn Dec. at ¶ 12, Ex. 4 (23andMe Refund

28   Policy). After 60 minutes, purchasers can only obtain a partial refund for up to 30 days,

provided they have not already returned their saliva sample. *Id*. In light of this restrictive return policy, class members had no guaranteed right of return when they registered their kits since that happened well after the product had been purchased. At that stage, purchasers were essentially forced to agree to the Terms of Service to access their results, or lose some, if not all, of what they paid for the PGS.

## III.   The arbitration clause in the Terms of Service is procedurally and substantively unconscionable, and cannot be enforced

Having earlier disposed of the question of *who* decides the arbitration clause here is unconscionable, the focus now turns to *why* it is unconscionable. Under California law, unconscionability "has both a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results." *Armendariz v. Foundation Health Psychare Servs., Inc.*, 24 Cal.4th 83, 114 (2000). These elements operate on a sliding scale—the "more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id*.

Here, there is both procedural and substantive unconscionability. Procedural unconscionability concerns unequal bargaining power between the parties and hidden terms included in contracts of adhesion. *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal.App.4th 1199, 1212–1213 (1998). The focus is on "oppression" (the weaker party's lack of bargaining power) and "surprise" (whether key terms are inconspicuous). *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal.4th 223, 246 (2012).

Substantive unconscionability refers to contract terms are "overly harsh" (*Stirlen v. Supercuts, Inc.*, 51 Cal.App.4th 1519, 1532 (1997)), "unduly oppressive" (*Perdue v. Crocker National Bank*, 38 Cal.3d 913, 925 (1985)), "so one-sided as to 'shock the conscience'" (*Pinnacle Museum Tower Assn.*, 55 Cal.4th 223 at p. 246), or "unfairly one-

1  sided" (*Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1071 (2003)). All of these formulations

2  reflect the same concern: Terms that are "unreasonably favorable to the more powerful

3  party." *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145, (2013) (citation omitted.)

4

### A.    The Terms of Service are procedurally unconscionable

6  Even a quick glance at the "Terms of Service" reveals the procedural

7  unconscionability. These terms are spelled out in a massively long document (18

8  printed pages) chock full of legal disclaimers that is presented on a take-it-or-leave-it

9  basis to customers who create an account with 23andMe. Those customers must agree

10 to the entire "Terms of Service" before the account will be activated, and, by means of

11 what can be charitably described as a "legal fiction[]," are presumed to have read and

12 understood the entire 18 pages. *Roldan v. Callahan & Blaine*, 219 Cal.App.4th 87, 94

13 (2013). The arbitration language itself appears only in a subsection of the very final

14 paragraph, captioned "Miscellaneous," and is not set up in a way that draws in the

15 reader's attention. On the contrary, only someone who was willing to comb through the

16 entire document before completing an on line sign-up would potentially see this

17 language.

18 Courts have found procedural unconscionability from much less. *See, e.g.,*

19 *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal.App.4th 1659, 1664 (1993) (procedural

20 unconscionability where arbitration agreement is "'hidden in a prolix printed form

21 drafted by the party seeking to enforce the disputed terms.'"); *Samaniego*, 205

22 Cal.App.4th at 1146 (agreement "was comprised of 11 pages of densely worded, single-

23 spaced text printed in small typeface. The arbitration clause is the penultimate of 37

24 sections which … were neither flagged by individual headings nor required to be

25 initialed by the subcontractor"); *Gutierrez v. Autowest, Inc.*, 114 Cal.App.4th 77, 89 (2003)

26 (arbitration clause inconspicuous, printed in eight-point typeface on the opposite side of

27 the signature page; buyer not told the lease contained an arbitration clause or required

28 to initial it).

1   Adding to the procedural unconscionability is the fact that the Terms of Service

2   mandate using the rules of AAA, but 23andMe neither provides those rules nor

3   specifies which of the many hundreds of rules might apply. This is significant. In *Harper*

4   *v. Ultimo*, 113 Cal.App.4th 1402, 1406 (2003), the court held it was oppressive to

5   reference the Better Business Bureau arbitration rules, but not attach the rules to the

6   agreement because "[t]he customer is forced to go to another source to find out the full

7   import of what he or she is about to sign-and must go to that effort *prior* to signing." *Id.*

8   (emphasis in original). Indeed, "[n]umerous cases have held that the failure to provide a

9   copy of the arbitration rules to which the [plaintiff] would be bound, supported a

10  finding of procedural unconscionability." *Trivedi v. Curexo Technology Corp.*, 189

11  Cal.App.4th 387, 393–394 (2010) (citations omitted); *see also Sparks v. Vista Del Mar Child*

12  *& Family Services*, 207 Cal.App.4th 1511, 1523 (2012), as modified on denial of reh'g

13  (Aug. 20, 2012) (failure to provide AAA rules rendered agreement procedurally

14  unconscionable).

15  Finally, 23andMe reserves the right to unilaterally modify the Terms of Service,

16  including the arbitration terms, without providing any prior notice to consumers (ECF

17  No. 70-10 , ¶¶ 26, 28, subd. (h)), which is yet another facet of procedural

18  unconscionability. *Sparks*, at 1523 ("An agreement to arbitrate is illusory if, as here, the

19  employer can unilaterally modify the [terms]"). All of this shows a high degree of

20  procedural unconscionability.

21

22  **B.      The Terms of Service are substantively unconscionable**

23  The arbitration clause drafted by 23andMe is pervaded by substantive

24  unconscionability and is fatal to its motion to compel. The clause is one-sided and

25  denies a person who makes a consumer claim against 23andMe any meaningful

26  remedy. First, the clause is cleverly but deceptively worded so that it exempts 23andMe

27  from its reach. The clause covers only "disputes *with* 23andMe," ECF No. 70-10, ¶ 28,

28  subd. (b) (emphasis added), and so it follows only claims made *against* 23andMe are

1   covered, not claims *by* 23andMe. In other words, 23andMe is free to avoid the arbitral

2   forum whenever it is advantageous, but anyone making a claim against 23andMe is

3   stuck with the onerous costs and burdens imposed on pursuing arbitration.

4   And they are onerous. A customer making a claim for refund of the purchase

5   price of the PGS due to deceptive advertising would have to: (1) pay filing fees of $975

6   ((ECF No. 70-20, p. 41); (2) arrange to have all of the necessary evidence and witnesses

7   flown to San Francisco; (3) pay for and provide an interpreter if any of the parties or

8   witnesses are not fully fluent in English; (4) become familiar with complex arbitration

9   rules or hire an attorney; and (5) be prepared to pay all of the costs of arbitration *and* the

10   undoubtedly substantial legal fees of 23andMe's well-heeled lawyers if the plaintiff

11   loses. ECF No. 70-10, ¶ 28, subd. (b). All of this potentially without access to discovery,

12   since, under AAA rules, the arbitrator has the discretion to deny discovery. *Sparks*, 207

13   Cal.App.4th at 1523.

14   Again, numerous courts have found these kinds of one-sided provisions to be

15   substantively unconscionable. *See Gutierrez v. Autowest, Inc.*, 114 Cal.App.4th 77, 89-91

16   (2003) (holding mandatory arbitration agreement substantively unconscionable because

17   it required plaintiffs to pay approximately $8,000 to initiate the arbitration process);

18   *Parada v. Superior Court*, 176 Cal.App.4th 1554, 1585 (2009) (concluding an arbitration

19   agreement contained in a securities purchase agreement was unenforceable because it

20   imposed unreasonably high forum costs without apparent need); *Roldan*, 219

21   Cal.App.4th at 94-95 (defendant law firm seeking to compel arbitration would be forced

22   to pay all arbitration costs or waive right to seek arbitration). Indeed, the court in *Parada*

23   relied on the inference that defendant's goal in drafting the agreement "must [have

24   been] to discourage or prevent [defendant's] customers from vindicating their rights."

25   *Parada*, 176 Cal.App.4th at 1582.

26   In particular, courts have identified several types of terms that make an

27   agreement unfairly one-sided and therefore substantively unconscionable, including the

28   following ones present here:

1    **Forcing customers to arbitrate their claims at the adversary's headquarters, far**

2    **from the customer's home.**  See, e.g., *Newton v. American Debt Services, Inc.*, 549

3    Fed.Appx. 692, 694 (9th Cir. 2013) (noting that "the arbitration forum provision requires

4    Newton, who resides in California, to arbitrate in Tulsa, Oklahoma—Global Client

5    Solutions's headquarters"); *Comb v. PayPal, Inc.*, 218 F.Supp.2d at 1177 (observing that

6    "[l]imiting venue to PayPal's backyard appears to be yet one more means by which the

7    arbitration clause serves to shield PayPal from liability instead of providing a neutral

8    forum in which to arbitrate disputes").

9    **Carving claims likely to be brought solely by the seller/defendant out of an**

10    **arbitration agreement, so that the customer was effectively the only one bound by the**

11    **agreement.**  *Merkin v. Vonage America, Inc.*, 2014 WL 457942, at *10 (citing *Mercuro v.*

12    *Superior Ct.*, 96 Cal.App.4th 167, 176 (2002) ("Countrywide requires the weaker

13    parties—its employees—to arbitrate their most common claims while choosing to

14    litigate in the courts its own claims against its employees.")); see also, e.g., *Armendariz v.*

15    *Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th at 120 ("[A]n arbitration agreement

16    imposed in an adhesive context lacks basic fairness and mutuality if it requires one

17    contracting party, but not the other, to arbitrate all claims arising out of the same

18    transaction or occurrence or series of transactions or occurrences").

19    **Imposing a short statute of limitations on claims, depriving the plaintiff of**

20    **remedies he would have had in court.**  E.g., *Ingle v. Circuit City Stores, Inc.*, 328 F.3d

21    1165, 1175 (9th Cir. 2003) ("[B]ecause the benefit of this provision flows only to Circuit

22    City, we conclude that the statute of limitations provision is substantively

23    unconscionable"); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 894 (9th Cir. 2002)

24    (reasoning that agreement was unconscionable where, among other things, it

25    "impose[d] a strict one year statute of limitations on arbitrating claims that would

26    deprive Adams of the benefit of the continuing violation doctrine available in

27    [California Fair Employment and Housing Act] suits"); *Samaniego v. Empire Today LLC*,

28    205 Cal.App.4th 1138, 1147 (2012) (arbitration provision was substantively

unconscionable in imposing a shortened six-month limitations period).

**Severely limiting a customer's legal remedies.** See *Newton*, 2013 WL 6501391, at *2 ("[T]he arbitration agreement increases Newton's potential liability for attorney fees as compared to California's codified fee shifting regime"); *Armendariz*, 24 Cal. 4th at 103 ("The principle that an arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees appears to be undisputed").

**Retaining the unilateral, unrestricted right to alter or terminate the arbitration agreement, without consent or even notice to the other parties to the contract.** E.g., *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d at 1065 ("Most federal courts that have considered this issue have held that if a party retains the unilateral, unrestricted right to terminate the arbitration agreement, it is illusory and unenforceable, especially where there is no obligation to receive consent from, or even notify, the other parties to the contract.")

Here, 23andMe's Terms of Service contain these same one-sided provisions, making them substantively unconscionable:

- 23andMe can change the terms unilaterally without notice.  ECF No. 70-10 at 18.
- The limitations period is shortened to one year. *Id.*
- 23andMe's liability is severely limited.  *See id.* at 16–17.
- Customers are saddled with the burden of traveling across the country to San Francisco for the arbitration. *Id.* at 18.
- The loser in the arbitration must pay both sides' costs.  *Id.* at 18.
-  The arbitration provision carves out from arbitration any claims made by 23andMe. *Id.* at 18.

There is no question that chilling claims is the consequence, intended or not, of the arbitration clause drafted by 23andMe. *See, e.g.*, Guthrie Decl., ¶¶ 1-4 (resident of Pennsylvania and primary caregiver for minor child); Dilger Decl., ¶ 8 (travel costs and work interruption would preclude arbitration in San Francisco); Stanton Decl., ¶ 8 (resident of New Mexico). Under 23andMe's Terms, a person who wants her money

back must be prepared to advance thousands of dollars just to initiate the arbitration and must be willing to risk losing a lot more if the arbitrator decides against her. Absolutely no one will weigh these costs and benefits and opt to proceed with arbitration on a claim worth less than $100, a fact that cannot be lost on 23andMe.

### C.     The arbitration clause cannot be severed

Finally, 23andMe suggests this Court can remedy the arbitration clause's unconscionability by severing the offending clauses from the rest of the agreement. That would not help. Nothing would be left behind.

Under California law, severence is inappropriate if "the agreement is "permeated" by unconscionability." *Lhotka v. Geographic Expeditions, Inc.,* 181 Cal.App.4th 816, 826 (2010). See also *Merkin* 2014 WL 457942 at *11. "The overarching inquiry is whether the interests of justice would be furthered by severance." *Armendariz,* 24 Cal.4th at 124 (quotations omitted).

As shown above, the arbitration clause here is permeated by unconscionability. If the unconscionable parts were removed, this Court would have to completely re-write the clause from scratch for it to even exist. That it cannot do. *Fitz v. NCR Corp.,* 118 Cal.App.4th 702, 727 (2004) (Courts cannot cure unconscionable contracts by reformation or augmentation).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **<u>Conclusion</u>**

For the foregoing reasons, 23andMe's Ominbus Motion to Compel Arbitration must be denied.

Dated:  May 28, 2014                    ANKCORN LAW FIRM, PC

*/s/  Mark Ankcorn*
Mark Ankcorn


CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP

/s/  Gayle M. Blatt
Gayle M. Blatt, Esq.

*Interim Class Counsel*